You may proceed, Counsel. Thank you.  My name is John Parker, and I'm here on behalf of the Plaintiff Appellant Reid Zeising. This, too, happens to be my first appearance here, so I appreciate your time. This case is up on summary judgment. Our claim for unjust enrichment was dismissed by the trial court, and there are five elements to unjust enrichment, one being an enrichment of some sort, an impoverishment, thirdly a connection between the two, fourthly the absence of valid cause or justification for that enrichment, and finally no other adequate remedy of law. The district court found that we had failed to provide adequate facts and or law for two of those elements, that being impoverishment, absence of valid cause or justification for the enrichment. I mean, why isn't the argument that, you know, your guy tried to sign up a deal with Shelton and they never did pay for anything, and so maybe he had hopes and dreams of some grand partnership that would have made a lot of money, but it just never came to fruition because they never agreed to any terms, and then Shelton's a free agent, he goes off and does his thing, and, I mean, I would be mad, too, if I was Zeising, but, you know, we have the wrong without a remedy kind of situation. I think he may have been morally wronged, but how is that a legal wrong? Well, unjust enrichment, Your Honor, is, Kate, it's broader than any particular remedy such as a contract, implied or express. That wasn't here, and that's acknowledged, but unjust enrichment, it's a development of Louisiana obligations law, and there's a lot of different ways you can have an obligation, one of those being specifically a contract, the other, of course, a tort or a delictual action. There's one or two others under Article 1757 of the Civil Code, but separate and apart from those things is the broad remedy of unjust enrichment. It's an equitable remedy. They list elements where if somebody gets something that they didn't pay for or weren't entitled to, somebody else did that with a reasonable expectation they would get at least something in return, they're liable for it. But why is Shelton not entitled to this deal? I mean, Shelton originated the deal, Shelton goes out and is fully liable for the debt or whatever it was, and is the one who's putting himself out there, so why is he not entitled to the deal and to do the deal? We're not arguing that he's not entitled to the deal. The issue here, and the problem is, Mr. Zeising provided professional services were absolutely essential to doing a business acquisition. For example, the... But he didn't do it as like an hourly guy, you know, the typical sort of, I'm more familiar with quantum Merowit, but the analogous situation of, I worked for you, and for some reason there's some problem with the contract or that fails or something, but I expect it to be paid. I, you know, mowed your lawn or something like that, and I should be paid for that. He was acting, he thought, as a partner or joint venturer in hopes of some future event, and why should we sort of paper the deal for him that he didn't paper, and the hope wasn't realized, and why is this not just one of many unrealized hopes in the lives of mankind? Well, I think for two reasons, Your Honor. One, there's a definite distinction between quantum Merowit and unjust enrichment, and I think the district court fused elements of unjust, or quantum Merowit with an unjust enrichment claim, which is improper. Quantum Merowit is much narrower, and it's the situation you described where there's really a contract, but there's no agreement really on what the price is. That's not what we're dealing with here. There's no reason under Louisiana law when expectation and co-ownership of a business can't be a justified expectation to gain, and he was acting in good faith. There was no reason to believe that he didn't, and I will tell you this, yes, I think there's a, he assumed the risk, as any business venturer would, that if the deal falls through. He rejected payment for his services. At the time. What he wants is the deal that wasn't papered. He rejected the idea that I provided professional services for which I should receive recompense under whatever the theory. He rejected that. So I guess I'm just struggling to see how there's a legal basis for what you're arguing. Unjust enrichment is simply not tied to a contract. It's to fill a gap in the law where something inequitable has happened, and this is the exact situation. I'm saying what's so inequitable here? Either he was a joint venturer and the venture didn't make, and that's just life, or he's a professional providing services and should be paid for them, but he rejected that. So what's the problem? It's not the fact that the deal fell through insofar as those two didn't mutually go through with the deal. It's the fact that, and he never assumed the risk that his supposed friend and business partner would cut him out of the deal and then apply the efforts, the fruits of his labor towards that very same deal which he was working to accomplish, and there's really no dispute. Due diligence is an essential aspect of any major business acquisition. Mr. Shelton would have had to go hire somebody top dollar to perform those tasks. He got it for free. He didn't pay a dime based on Mr. Zeising's efforts. Mr. Zeising thought he was going to be a co-owner in this business. It didn't pan out, but he certainly never expected, and he shouldn't be held accountable to expect that his supposed business partner would turn on him and take the deal for himself and use his professional services to his advantage without paying for it. Now, you're correct that he turned down the money, but the time that that occurred was pretty soon after he'd been cut out of the deal. He was very much under the unfortunately mistaken belief that he was in fact a co-owner in that time, it was his impression that he was going to receive a 30 percent ownership and that being paid an hourly wage rate was not something he comprehended or ever contemplated. Also, let me ask you, in your understanding, is there a difference in your allegations about what is in the evidence and opposing parties' allegations? How far did your client, under his assertions, your assertions in the brief, get with GE versus what Mr. Shelton's counsel is saying? My understanding from your briefing is that your client actually put the deal together with the final terms, essentially, with maybe some slight modifications. Shelton's brief, without record sites, very good on record sites until this part, says in October, GE informed Shelton they would not offer financing along these lines, but then it reversed itself and issued a commitment letter to Dixie for the TMC transactions. Shelton rejected the proposal. The asset purchasing agreement between TMC and Dixie was terminated. Are you agreeing with the way Shelton has set out in his brief what happened, which is that the deal was not finally put together by GE, by your client with GE, but that it failed and that GE had to come back to Shelton to say, okay, okay, we want to proceed with this after all? I believe what happened after Mr. Zeising was involved is disputed. How far did Zeising get is my first question, so I'm not looking at what after. How far did Zeising get with GE? In terms of what he did for them? Zeising's role in this, in his actions? I don't want his role. I want to know, did he get an agreement with GE? I'm sorry, you're doing a good job and your time's running out and I'm just trying to focus you on exactly what I'm interested in. What part, what did Zeising not get GE to agree to, if anything, that GE finally did agree to directly with Shelton? That's a disputed issue. I don't think there was anything in terms of, they had a commitment letter from GE for the 100% financing, which is what he was asked to help get, and which he did. It went from $22 million in financing to approximately $30, which is over the amount of the sale. At that point, I think there was an August 30, 2011 commitment letter where there was over 100% financing. The only collateral that had to be put up by Mr. Shelton was two leasehold interests and other restaurants. It was ready to go at that point. At that point, though, Mr. Shelton, and this is disputed, says, well, Mr. Zeising, I asked you to put up some of your own collateral, and at that point I realized you didn't want to do that, and so I backed out of the deal. But in terms of the loan, I believe that was ready to go. All that had to be done is fire off on it. Let me ask you, we were talking before about, you know, he reviews payment for his services and all that, and you said, well, he was angry and whatever. If we were to reverse and remand, what relief would you be seeking in the trial court? The measure of damages is either the enrichment or the value of the impoverishment, whichever is less. In this situation, I think they'd be very similar. It's something you'd have to go to the jury. I couldn't tell you exactly what that would be. I'm not asking for a number. I'm asking for, like, when you got up in closing arguments and asked the jury to calculate something, would it be based on the value of his services? Would it be based on his 30 percent? What would it be based on? No, Your Honor. This would—it's not that we're not seeking co-ownership. That ship has sailed, so to speak. We're looking at the enrichment, at the very least, was the value or the payment that Mr. Shelton would have made for that type of professional service, which would have been by an investment banker of some sort for professional consulting on financing the loan, negotiation, and then the due diligence. It will be times hours kind of analysis. Something along those lines, yes, Your Honor. But it can't be underestimated. Mr. Zising performed due diligence. You have to do due diligence. What is due diligence? You're dealing with buying 30 restaurants. Somebody on the buying end of that deal has to look through the books. They have to say, well, this Popeye's entity says— Okay. The best hours times reasonable rate. Correct. You could go on an open market and hire a due diligence guy or gal, and they would go do that, and they would charge presumably some sort of fee, and that's the figure you're going to ask the jury for, whatever that is, if you're given that opportunity. Correct. And the reason I was going that direction, Your Honor, is to simply point out that there's no question that is of benefit. It's of value to Mr. Shelton. He got that for free. And that's the definition of unjust under the Louisiana law. Counselor, I certainly agree that that seems to be a pretty common-sense definition. What bothers me on the five-factor test for unjust enrichment is the fourth factor, which is an absence of justification or cause for the enrichment. And a lot of—not a lot of case law, but some of the case law seems to be focusing on just whether that act done by the enrichee—I just hate these terms—but by the person he was claiming wronged, your client, was a valid act, was something for which he, either by contract or otherwise, was entitled to do. What do you make, not of your overall case and the injustice of it, what do you make of this fourth factor, and what do we need to look for on justification or cause that would fit your facts? I would say that the cases relied upon by defendants, those cases are distinguishable in the sense that almost every single one of them, there was an underlying contract, literally a contract, which we don't have here, between the impoverished shee and the enrichee. And for one reason or another, the impoverished party didn't fulfill his contractual obligation to recover. And for instance, I believe one of them might have been—well, I won't say the name, but one of the cases dealt with, I think, a real estate broker, where he signed the contract, said you have 30 or 40 days to find me a buyer. It didn't happen. Now, he made some contact with Warren, but it didn't happen during the time period he was required to do so. The seller then went and did the deal with that person. Well, there was a contract. You had terms and conditions that applied. We don't have that here. Secondly, I would say that that fourth element really is not just a throwaway formality. And I think it would set a bad standard to say that as the enrichee, all you have to do is go sign some written contract with some third party to justify, well, I acquire the restaurants. That's my enrichment. That's way too broad and ignores the actual enrichment here. Can you dispute that the deal was done over, dead, and GE came back to Shelton? We do dispute that. Based on what evidence would bring that into dispute? What would make that a material fact dispute? What evidence? Well, the facts in our affidavit testimony would show that, in the commitment letter would show that as of August 30th, I believe, 2011, the loan terms were met. All that had to be done is that contract signed. You get the loan and the asset purchase agreement. The terms of those agreements- He said no go, and the deal died, and then GE contacted him later. What evidence do you have that that did not occur, that that's an inaccurate statement? I don't think we're necessarily in a position to dispute that that happened, but it happened weeks after he had let Mr. Zeising go, I believe. When he let him go, all the conditions were met. Whatever happened in between then, if he and GE had a disagreement over something, the bottom line is it came back to the materially identical loan terms and asset purchase agreement terms that existed the day Mr. Zeising was shown the door. What concerns me about that, and it goes back to the earlier question, is that gets back to without justification or cause. It seems to me, as harsh as it sounds, that if GE came back to your opponent and said, let's start this back up again, we've changed our mind, that fourth factor may not be met on your part. My understanding is that that's not exactly what happened. I think they wanted to reduce the loan terms. They said, you know what, I'm done. They came back and they offered the same loan terms that had initially been there when Mr. Zeising was there. Why don't you give us, with your short time left, what we need to go away from your argument? The absolute, and I just, to me, I can't get past the fact that due diligence, which is absolutely essential, was done by Mr. Zeising. Shelton did little, if any, there's no real evidence to show that he did any due diligence. One thing I can tell you for sure is between August 11th and when the deal was ultimately kinked, after Zeising had left, and maybe the terms, or that there was some more negotiation, but Mr. Shelton did not do any additional due diligence, and that's worth something without question. Thank you. Good morning, Your Honors. My name is Charles Weems, I represent Mike Shelton, the defendant in this case. Your Honors, obviously you're very familiar with the facts, but I want to address two things when I start here, because they were the focus of some questions. One, and I'm sure counsel is simply mistaken in his statements to the court. As of the date that Mr. Shelton was told, Mr. Zeising, that there would be no more arrangement between them, that if he went forward, he was going forward on his own, there was no deal. The only thing that had occurred was that an application for financing had been sent in to GE, GE hadn't even looked at it, so it is totally incorrect to say that this deal was ready to be signed as of the time that Mr. Zeising was told by Mr. Shelton that he let him go. Mr. Weems, was the deal, though, that was ultimately entered, however, whatever transpired in between Zeising's leaving the process and it being signed, was that essentially the same deal, or was it 100 percent financing was the final deal, and the last thing Mr. Zeising was able to get still required $6 million of your client's money? It was very similar, Your Honor. As to the facts that were asked about, there's no question, it is undisputed that this deal was dead, because Shelton got a call from GE that originally told him, look, we're not going to do the financing, you're going to have to put up all this money, and Shelton said, well, forget it, the deal's dead. They followed up, they sent a commitment letter, which he also rejected, and it was over. As the GE people testified, pencils were down, it was done. Then Shelton was sought out by the head of GE Finance at a meeting a couple of months after the Zeising business was through, brought back up, they ended up doing the deal, and I would say certainly the financing was substantially similar, it was not identical, but it was substantially similar. And of course, it was 100 percent financing, 100 percent in the sense that Mr. Shelton had to put up everything he owned, his entire patrimony, including his life savings in order to make it happen. As security? Yes, sir. If he didn't have to put in his own money in, he might have to, if he lost his security. Exactly. No longer putting $6 million into the deal. He was completely on the hook, and that's the reason, ultimately, that he cut off the deal with Zeising, because he found that Zeising, unlike what Mr. Shelton hoped, brought no value but was just going to bring additional expense, and Mike was going to have to carry the whole burden. Turning to the law, I think it's real clear- Why not compensate Zeising for time that he put in that was valuable? Nobody said it wasn't valuable, what he did. Why not compensate him? I don't know whether it was valuable or not, Your Honor, to be honest. There would be some dispute about that. I don't think it's necessarily material, but Shelton, out of friendship, I think were the words that he said, to salvage a friendship, were the exact words, offered to give him compensation and Zeising turned it down. He insisted, and that's the problem that he's got in trying to say that my impoverishment was that I spent this time under the unjust enrichment law, just like it is under quantum merit for similar situations in just about virtually every other state that we found. If you go into the situation not expecting to be paid, not expecting compensation, but just chasing a business deal, that will not support a recovery in unjust enrichment or quantum merit, and that's where we are today. I think . . . In terms of the five factors of an unjust enrichment in Louisiana, if you accept that there are five factors and that's the right case law, what factor does he fail on or fact towards? Well, I think the first thing, Judge, I don't think that there's any impoverishment, as that term is used in Louisiana law. In the briefing, it's very clear, and the reason that he does this is also very clear, Zeising claims that his impoverishment is the loss of the 30% deal. So Judge Haynes, to address your question, if this case went back, if it was reversed and remanded and went back for trial, we'd go through that entire business, incredibly complicated factual situation that ultimately was resolved by Judge Trimble and affirmed by this court, because they would have to show that that was the impoverishment. That's what they claim. Now the damages might be limited by the enrichment side of the equation, but they say the impoverishment is the loss of that 30%. That's not . . . Well, I thought he said to me today it was the expenditure of the time. I heard that also, Your Honor. That's not what they said in brief. Now if he says it's the expenditure of time, then from the theory of unjust enrichment and the requirements, you run right smack dab into, but you did this with no expectation of payment or compensation. And you see, that's what he's relying on, because the total statement about what impoverishment is is either your assets diminish or your liabilities increase. Well, they've never claimed that was the situation here. They go to this kind of third jurisprudential test, which is some justified expectation of gain was not realized. Well, if he says, I didn't get paid for my time, he can't say that he had a justified expectation of being paid, because he's testified, he pled, and it's in his brief that he didn't expect to be paid. The only thing he wanted was a piece of that partnership. He was trying to get that business opportunity. Let me ask, to some extent, Mr. Parker, I think it is, when the opposing counsel was indicating, talking about trains leaving the station or vessels leaving the port, I'm not sure what he said, it's more of a practical answer I thought he seems to make. The briefing and the argument they've made is that he was entitled to 30 percent under unjust enrichment analysis, but in a way conceding that maybe the only thing still left on the table would be some pay for services. Is that, I don't know how that would play out on Louisiana doctrine, that you're more or less accepting that I can't get what I'm really, under the law, should be entitled to. I mean, it seems like his argument has been for the 30 percent, and so let's look at it in those terms at least right now. Where does he fail if he's in fact seeking 30 percent of the deal? Where does he fail on unjust enrichment analysis? Because I think, in fact, that the impoverishment and enrichment would still work, so long as you could show that was agreement, it's one of these other factors. Well, for one, as Judge Trimble aptly pointed out in his opinion, Your Honor, he assumed the risk of this loss. He walked into the deal knowing that the deal might not make, that he didn't have a deal. Now, he tried to make all these arguments, in Zeising one, about why there was a deal from a single breakfast meeting at which nothing was known, a meeting that Judge Reveley commented on, so that must have been some meeting, but what we ended up with is the man's chasing the deal, just like Shelton was. He assumed the risk the deal wouldn't make. He acknowledges in his own testimony, he knew that it was a chance that the deal wouldn't make. He knew that somebody else might get the deal, but what he says is, but I didn't run the risk that Shelton would take the deal. Well, wait. If you knew the whole deal couldn't make, how have you somehow, how did you reasonably expect that Shelton wouldn't take it? Assuming risk sounds like we're incorporating some different law here, but to use this in a non-technical way, it seems to me he was not assuming the risk that he would be cut out after putting the deal together. Now, that is factually disputed by you, whether he put the deal together, but I think that is the risk that was assumed under unjust enrichment law, not under tort law, and that to me is, you can tell which, I mean, it seems to me that there wasn't, you know, just walking through this, if you're looking at the 30%, there wasn't an enrichment to your client, an impoverishment for all this effort on the part of opposing party, certainly a connection between enrichment and impoverishment, and it seems to me the last two factors are somewhat in question, and it does seem to me under Louisiana law, at least arguably, so long as your client had the right to close the deal with GE, that perhaps there's no unjust enrichment, which really guts to me the whole idea of the injustice potential of it. What is your understanding of what is sufficient to satisfy, on your client's part, that there really was cause and justification? Well, I think the cause and justification issues are very substantial, Your Honor, and let me address those. First of all, there can be cause for the impoverishment, and remember the impoverishment he's arguing for here is a loss of the 30%, and there can be cause for the enrichment. Let me address both of those. In the Ramsey case that we cited, the court there found that where a guy was chasing a deal, the deal didn't go through, and he said he was out of his time, he had done this, the court said, well, that is not justification for the impoverishment. Let me turn to what I think is a stronger situation. The justification for impoverishment can come from a juridical act or the law. Now, think about what he claims is his impoverishment, a loss of 30% in this deal. What happened in Shelton 1? The court looked at every conceivable theory that could have been raised by Mr. Zeising as to why he should have some basis for owning an interest in this business and found that there was no basis. Isn't that dispositive of the question of whether or not there could possibly be a justified expectation that he would have an ownership in the business? It seems to me it is, otherwise, Zeising 1 means nothing. We're just going to go back and try it all over again, and let me flip to the other side. Did the enrichment have cause? That can occur two ways. It can occur because of a contract, which in this case would be a contract between the alleged enrichee, Mr. Shelton, and a third party, or it can occur because of the efforts of the alleged enrichee. Well, look what Shelton did in this case. His efforts alone constitute justification, just like it did in the Creeley case and in Garber that we cite in our brief. Shelton had the deal. He knew the buyer. He had the financing. He could do the thing all by himself. He didn't need anybody to help him do the deal, tell him that he could encumber his entire patrimony and buy these restaurants. Why did he even have breakfast with Zeising and do whatever he did? Why was Zeising even involved if Shelton didn't need him? He hoped he could bring some money, some investors, some way to lessen Mr. Shelton's risk. Zeising to go out and get some additional capital, either of his own or another? That was the idea. And it's replete in the emails. They looked at venture capital firms. They looked all over the place. But in the final analysis, when it finally came down to it, Shelton found out, I got the whole deal. You know, I'm not going to give somebody ... So what you're saying is that this $6 million wasn't supposed to be just getting GE to loan more, but rather to get somebody else to put some skin in the game. Mr. Shelton was trying to reduce his risk. That's correct, Judge. By someone else putting in capital. Somebody else putting in capital. Or taking the risk of the $6 million or whatever. Right. Or not requiring his collateral. I mean, you know, something. That's when it fell apart when Zeising either didn't have it or wasn't willing to put in anything besides his own sweat equity. When they finally got to the August 30th application that they were going to make after Zeising admittedly talked back and forth with GE and had to actually put it in, and Shelton had to sign it and send them a $50,000 check and say, this is the loan I'm applying for. It's me. I'm putting everything I have up. Do I want to do that and give Mr. Zeising 30% of this deal? He said, no, I don't. I'm sorry, Reed. I know we're friends, but I just can't do it. And that's the way that came down. The record is clear. But to get back, Judge, to your question, which is a good one, whether there's just cause for the enrichment, there certainly is. The cause is found in Zeising's, I mean, in Shelton's own efforts and in the third-party contracts that Shelton negotiated, entered into, encumbered himself, his assets in order to make it happen. And that's very similar to the Conbar case that was cited by Judge Trimble in his opinion. It's very similar to the Creeley case in which there was a realtor whose contract had run out. Ultimately, the person that the realtor had introduced the seller to was the same person that ended up buying it. So the realtor came back and said, well, look, I'm the procuring cause of this. From a standpoint of unjust enrichment, I should be paid because you're not having to pay a commission, and yet you're selling the property to the person that I pointed out to you. Well, the court said, well, maybe in a sense that constitutes an enrichment, but if it does, it's an enrichment that has cause, because we find that the sale resulted from the efforts of this person and from these contracts that he entered into. The same thing in Conbar with the sale of the business. It was a contract, but it didn't apply. Same thing in Garber, which was a lawyer trying to make a claim on a contingent fee contract that he said he had worked on with an understanding that he would get a piece of it. Didn't work. The court said no. The reason was the third-party contract these lawyers had with their clients. That's justification. If there was any enrichment, that is just cause for the enrichment. So I think in the final analysis, Your Honors, Judge Trimble got it right. There wasn't any impoverishment within the meaning of the Civil Code, within the meaning of this Civil Code article, and any enrichment or impoverishment that occurred were elements that did have just cause. They were supported both by Mr. Shelton's own acts and by the third-party contracts. And the impoverishment itself finds cause in the law, because Shelton, one, said it's not unjust for you not to get this 30% of the business, and if we were to hold otherwise today and send it back, we'd just be really getting that whole thing as to whether or Judge Trimble and this court have already spoken. I suggest, Your Honor, there are a number of reasons why this unjust enrichment claim must fail. Thank you. All right, counsel. Thank you. Mr. Parker? What was apparent to me and I think should be apparent to anyone really is that the extent to which who created more value to accomplishing certain aspects of this deal, like who negotiated better loan terms, those things are clearly, at the very least, disputed issues of fact. What's also clearly disputed is what Zysing's purported role in this transaction was. Mr. Zysing says, I was never at any point asked to put up any money. My role was the financing role. I was supposed to get better loan terms, which meant try to get 100% financing, which occurred. My other role was to perform the due diligence. When it comes to a justified cause, Defendant Cyte Ramsey, I can't help but laugh because Ramsey dealt with a case where the impoverished party was already paid, paid about $6,000 for his effort. For whatever reason he wanted more money, the court said no. When it comes to justified cause, the sale itself in this case cannot constitute justification for the enrichment. It's actually a component, part of the enrichment, in the sense that what Mr. Zysing was doing was very directly and for the sole purpose of helping facilitate the acquisition of these restaurants. So to say that, well, the justification for my enrichment is the contract itself, the sale, well, that's missing the point. The direct benefit he received was the professional financing services that Mr. Zysing provided. When it comes to damages, I don't want to misstate, I'm pretty sure, though I don't believe that I ever asked for 30% ownership as a remedy here. And the reason, first of all, we lost that claim. But unjust enrichment is not about providing you with your expected payment of a failed contract. It's an equitable remedy. It's supposed to restore you to where you were. The most I think you could get here is either the value of the professional services he provided, either looking at it through the lens of him as an impoverished ye, or Mr. Shelton as the enriched ye. To what extent did he benefit from not having to pay for those services that he, and by the way, one thing you'll never, I haven't seen, is any justification for free due diligence in the contract of sale, the loan terms. In fact, in the contract of sale, it was Mr. Shelton's obligation to take care of that for himself. It was his obligation to go check the books of the company he was buying. Mr. Zysing did that for him. So, in closing, your honors, there's unfortunately a misunderstanding, but our client certainly acted in good faith. He was led to believe he was going to be a part of this company. He did what he was asked to do, at the very least as disputed, and at the end, the deal didn't come through. But the risk at issue is not whether a deal came through, it's do you take the risk when you do business. Every single time you do business, you assume the risk that your business partner is going to say, you know what, I really don't want to do business with you, I'm going to do it for myself. And I'm going to take the professional service you provided, act on them without paying you. That's all I have. Thank you. An interesting case. Thank you both for your explanations. That is our docket for the day.